Counsel, you may proceed. Good morning, Your Honor. I'd like to reserve five minutes for rebuttal. Okay, I'll try and help you. This case involves what has been a long-standing principle of insurance law in California. As early as 1958 in the Ivey case, where there's a possible excess liability of an insured, it is the duty of an insurance company to communicate the results of their investigations to their insured and must inform him of any settlement offer that might affect him. In 1957, in Brown v. Guarantee, the court said in considering whether an insurer acted in bad faith, the failure of the insurer to inform the insured of a settlement offer is a factor to evaluate in bad faith. In the merit case, when an offer is made and there is an excess liability exposure to the insured, and the offer is made within the policy limit, the merit case says a genuine and immediate conflict of interest exists between the insurance company and the insured. What we have in this case is no evidence, zero, that the insurance company ever communicated to the insured, Ms. Ingram, the fact that there was a settlement offer for four claimants, a wrongful death case and three seriously injured persons, to settle within the policy limits. Counsel, I have two problems with your argument. First, it wasn't a complete offer to settle because it didn't include, is it, Jarrett, the fifth claimant? And secondly, as I read the correspondence in April and May of 1997 between Plaintiff's Counsel and the insurance company, there is repeated reference to the initial April 25, 1997 letter, which suggests to me that the offer was still on the table and the parties were still negotiating and it had not been completely rejected by either side. And then if I can add one other complicating fact, the record seems to be clear that at some point during that period there were communications with the insured who insisted not a penny in tribute to millions for defense. Okay, let me address those three issues in order. First of all, you said it wasn't a complete offer because it didn't include Jarrett. That's not the standard. The standard is not whether or not it includes all the plaintiffs. But wouldn't it be a breach of the insurance company's obligation to the insured had it accepted that offer, leaving her exposed to a claim by Ms. Jarrett? If they paid out their policy limits? I believe it was a breach for the insurance company to either accept or reject it without first communicating the settlement offer to its insured. I understand. I mean, you want us to declare that's a per se $2 million failure to make a phone call. Right, or send a letter. Or send a letter. But what I'm focusing on is the fact that because it was a partial offer, it didn't fully relieve the liability hanging over the head of the insured. And had they paid out their $30,000 policy limit, they would have left her exposed to Ms. Jarrett. And as I read California law, had they done that, that would have been a separate breach on their part of the duty of good faith to adjust the claim on behalf of the insured. Is my understanding correct? Partially. And here's where I think the distinction is made. The decision as to whether or not to use that $30,000 to settle the very large exposure has to be Ms. Ingram's decision in the first instance. And the only way she's going to be able to make that decision is if she's informed of it. So she may decide, and the Merritt case talks about this, the Kinder case talks about this, the Anguiano case talks about this, is that there has to be a communication to her, even if there's other claimants involved, of the fact that there was a settlement offer to settle that portion of the case. And she may decide that, look, I want you to settle those cases, those claimants, and I will deal with Jarrett on my own. That's her decision to make. But that's not what she said when the plaintiff's lawyer communicated with her directly, was it? Well, here's where I think the court is misreading what the evidence is. The evidence that you're referring to is the May 22nd note. And the May 22nd note says that she was contacted by the plaintiff's attorneys for the Blankenbakers and the Shapley's, and that he told her to write a letter. There is nothing in the note that says that she was told by anybody, the plaintiff's attorney or Mr. Kiefer, who's the claims adjuster, that there was a pending settlement offer. All we have is that note saying, write a letter, tell us to pay the policy limits. And she reports that. Well, doesn't that mean that the negotiations are still open? If the victim's lawyers are telling the insurer, do this, that must mean the offer for policy limits is open. No, it doesn't mean that. It doesn't mean that at all. How could it mean anything different? Tell me that and I'll go away. The reason it can mean something different is because what the plaintiff's attorney is trying to communicate to the plaintiff, to Ingram, is to communicate with her insurance company to pay them the policy limits. It doesn't have anything to do with a pending settlement offer at all. Let me refer you to ER 64, which is the letter from McClarity & Associates, Jay McClarity representing the Blankenbakers and the Shipley's dated May 23, 1997. It's a letter to Mr. Kiefer, the claims adjuster at Progressive, and he references the fact that Progressive is not going to pay out the 30,000 policy limits to his client, but then he goes on to say, I advised you that we should try and reach a settlement with the passenger and offer my clients the balance of the policy limits. Then he refers to what he set forth in his letter of April 25, 1997, which suggests to me that April letter is referenced four times in the letter that they're still negotiating, and we know that as of May 23, there had been a conversation between the plaintiff's lawyer, Mr. McClarity, and I guess there's also evidence in the record that there was a conversation between Mr. Kiefer and the insured at some point during this period. Let me address it first. Mr. Kiefer's deposition testimony says that he does not recall ever communicating any settlement offer to Ms. Ingram. So whatever Mr. Kiefer said, he said, looking at my notes, I can't see and I can't tell whether I ever communicated a settlement offer. But didn't you tell him during that conversation, I don't want to settle because it's not my fault? You're talking about on June 19. That's well after the date that the settlement offer expired. Now the April 25 letter that you're referencing is referencing a date of May 23 for the settlement offer to expire. We have in the record that on May 13, Kiefer told McClarity that they're rejecting the settlement offer. So the settlement offer is rejected as of that date. I'm not so sure. If that's the case, then what's the purpose of writing Progressive on May 23, urging them to continue settlement discussions and to accept that policy limits offer on behalf of his clients? That doesn't sound to me like settlement talks are over. The fact that settlement talks may not be over does not mean that the settlement offer had not already expired. In Anguiano, there were two settlement offers that were made, and it was the failure of the insurance company to communicate either one. The fact that there were further communications trying to resolve the case on behalf of the Blankenbakers and Shapley's does not resurrect a settlement offer that's already expired. Your theory is, is that the April 25 offer expired because on May 13 it was expressly rejected, correct? Yes. All right. So if there's anything after that date that indicates another offer or a reopening of the first offer, then that's going to be a problem for you, correct? That is not a problem for us. Well, assuming that's the case, it would be a problem for you, right? It would not be a problem because once the settlement offer has already expired, the fact that there's further communications and further settlement discussions does not resurrect an already expired settlement offer. Why not? I mean, he's talking on May 23. I advise you that we should try and reach a settlement with the passenger and let everybody decide how they're going to allocate the $30,000 amongst themselves. That looks to me like another settlement offer. It's a different settlement offer. But that just follows a few days after the victim's lawyers had talked to the insurer herself and said, encourage your insurer to do this. It sounds like it's either a renewal of an old offer or a brand new offer or they never considered the first offer closed. If it's a brand new offer, the insurance company has a separate duty to communicate that to its insurer. Well, they didn't have to. That's my point is because sometime before May 22 and after May 13, she was told, she, the insured, was told, do this with your insured. Get them to make a policy limits offer. But that's an inference on a summary judgment motion that plaintiff is entitled to have a strict construction as to what that note says, that there's only communication to write a letter. There's no discussion of a pending settlement offer at all. That's an inference that has to be read into the record that even Mr. Kiefer is not willing to make  Judge Gould, if I could interject just so clear I have this in my mind. The insurance company got its summary judgment, correct? Correct. Appealing that. You're not asking us to reverse that and declare your client wins on bad faith. As I understood it, you're asking us to send it back because you think there are issues of fact. Is that right? That is correct. Okay. Then if there are other settlement discussions following the termination of the offer that was not passed along, why isn't that just part of the facts that the court would have to consider? That's a fact that the trial of fact would have to consider. As far as a summary judgment motion, the fact that the settlement offer had already expired and there were subsequent settlement discussions does not relieve the insurance company of the obligation to talk about the earlier settlement offer. The basic idea that the insurance company was supposed to tell Ms. Ingram, we have this settlement offer that policy limits. It doesn't cover your passenger who also has a claim. But do you want us to accept that? Do you want to accept that offer? In that one? Yes. Your point is that a rational insured could sometimes decide, yes, although it doesn't cover everybody, I want that to be accepted and I'll take my chances with the passenger. Yes. Or I want to pitch X thousand dollars into a kitty to add to your policy limits and see if you can negotiate it. Correct. Or I will talk to my... If we send this back, what happens at trial? I mean, what does the evidence look like that the progressive submits, some of which I think my colleagues have asked you about, and what's the evidence that you submit that's contrary to that, that could let a rational jury say there's bad faith? Because they took the decision away from the insured. The law in California is clear that the insured must be informed of not only the fact there's a settlement offer, but what the results of the investigation are by the insurance company. For example, the insurance company had already concluded that their insurer was 100% responsible. They had already concluded that the claims that were being made by the Blankenbakers and Shapers far exceeded the amount of their policy limits. Those are all factors that should have been disclosed during the time the initial settlement offer was pending. The fact that there were subsequent settlement discussions does not relieve the insurance company of its bad faith for failing to disclose that information to its insured and taking the decision away from the insured and remember, Garrett was Ingram's guest passenger. The decision is actually the insurance company, is it not? It is not. It can decide to reject it. Isn't that what the policy language says? It is not. That is not what I read in the policy language. Well, we can ask progressively. You ask for five minutes, go ahead and make whatever comment you want, but then let's hear from... Yeah, let me answer that question. The decision in this instance is Ingram's decision in the first instance. The merit case talks about a conflict of interest that exists when there is an excess liability. When there is an excess liability on behalf of the insured, the insured may decide, like, I will contribute some money to it, I will have some other mechanisms, I will hire my own attorney to defend this other claim out there. I thought she was impecunious. She indicates she had no assets. Well, your plaintiff's lawyer had done, had he not, had done an asset check and had determined that she was essentially judgment-proof. He said he was going to. Oh, he was going to. I thought he already had done that. No, he had not done that. But my point here is that Garrett was in the same vehicle with Ingram. So if Ingram had been informed, all the claims can go away because we have a settlement offer from the Bank of Bakers and Shea Police. All you have to do is convince Garrett not to bring her claim, and she actually ultimately did dismiss her claim. But she did bring one. She hired a lawyer and sued, or did she not? No, she hired a lawyer, but she didn't sue. He sent a demand letter on her behalf. That was way after the fact, after the offer was expired. You did go over. I'll give you a couple minutes in rebuttal, but let's hear from Progressive. May it please the Court. My name is Michael O'Neill. I represent an appellate at Progressive Casualty. We are not here today because Progressive sought to save a penny off the policy limits of $30,000. There was no counteroffer. There was no effort to chisel down the demand. We are here today because Progressive insisted upon complying with clear established California judicial authority. Well, it complied with one, but why didn't it make the phone call to the insured to tell her what was going on? I don't have any evidence to run on the record that that conversation with Ms. Jarrett occurred. The record we have is... Well, Kiefer couldn't remember such a record, and his file notes don't reflect such a communication. So can't we infer from that fact that no such communication ever occurred? I have no evidence of such a communication, Your Honor. One way or the other. One way or the other. And that's basically the state of the evidence. I'm being canon with the Court. Well, wait a minute. He said, I don't remember whether or not I did it. Yes. In one occasion. In another occasion, he says, I don't remember doing it. The inference of which is, I didn't do it. Correct? Well, that's what defies the concept of summary judgment. That in itself is a genuine issue of material fact, isn't it? Not in this case, Your Honor, and I can explain why. Okay, please do. This demand was not a reasonable settlement offer. It did not include claims that were released for all the claimants. That's clear. Ms. Jarrett had significant personal injury. Broken jaw, smashed face, broken kneecap. And that is not to suggest that the Blankenbakers and the Shipleys did not suffer injury either. Mrs. Blankenbaker died in this accident. It's a tragedy. I think we all can feel that way. But there's only $30,000 in the policy limit that Progressive had to work with. The demand comes in on April 25, 1997, and it is open for 30 days. The demand is not a reasonable settlement offer. Progressive, as a matter of law, could not accept that demand. Could not accept it because it did not include the claims from Ms. Jarrett. That's what it's down to. Counsel, Judge Gould, if I could interject. I totally agree. Progressive could not accept that, leaving a claim outstanding without creating some other claim. But why is that answer whether they should have communicated the offer to the insured? Because couldn't the insured go down a different track and say, yeah, settle with the people in the other car and I'll throw in something or I'll take my risks with my passenger? It's certainly unhypothetical, Your Honor, and that same argument was raised. Well, let me ask this. Apart from saying it's hypothetical, isn't that a right that the insured had? And also, why is it that Progressive doesn't have a policy that uniformly requires passing along settlement offers to insureds? It does, Your Honor. It does. We don't have the evidence in the record of Mr. Keefer saying, I sent the letter. We don't have it. So the company had a policy, but we just don't have any proof that the policy was complied with. Correct. In this episode. Correct. Then why isn't that a fact issue that a jury should be able to evaluate as to whether they were acting in bad faith by not passing on the offer? And your guys would come in with evidence that, well, we have this policy, and we always do this, we just don't have a record of it here. And that would be the fact question. And I realize Ms. Ingram isn't asserting this claim herself, but as I think it's her right to do, she's assigned a bad faith claim to the current parties in interest who are asserting it. Get out of the judgment against her. Justice Gold, she certainly could, and she did. And she's available to testify. She's available to provide a declaration and sworn deposition testimony that if I had known, I would have done this. And what plaintiffs needed to submit in response to the opposition were sworn statements or deposition testimony from Ms. Ingram that says, if I had been told about this, I would have done the following. I would have gone to Ms. Jarrett, I would have said to her, I know you've been damaged, I know you have a broken face, broken kneecap, but I need you to walk away from the policy and not get a single dollar to give relief to me. And they need a parallel declaration or sworn statement from Ms. Jarrett who said, if I had been approached, notwithstanding the fact that I have thousands of dollars in medical bills, I would have released Ms. Ingram. That is required. The world doesn't operate in a perfectly symmetrical fashion. And lawsuits are not perfect and everything. It seems to me that California law would say depriving her of the opportunity to communicate with her insurer as to what her alternatives were to do would be, sweeten the pot. It appears that could not happen. Or talk to my passenger who is either a friend or I think there's some suggestions it was her cousin, to just go away. And she was deprived of that opportunity. There's no necessity under those circumstances to come in with an affidavit. She was deprived of that opportunity. Why is that a wrong view of this case? Yes, every breach of a duty, Your Honor, requires damages approximately caused by the breach. You have to have a causal relationship. No one precluded plaintiffs, sorry, the appellants in this case, from obtaining that information. It's fairly clearly available to counsel for the appellants to depose Ms. Jarrett and say if you had been told this was out there, what would you have done? No, you're missing the thrust of my question. My question is why is that necessary to avoid summary judgment under California law? My understanding California law says if you deprive the insured of the opportunity to contribute something, including maybe talking her passenger out of suing her, then there's been bad faith. No, Your Honor. Bad faith is a tort. And I don't mean to speak down to the court. I want to make this very clear. Bad faith is a tort. You have a duty, you have a breach, and you have damages. You have to have causation, which means in response to Rule 56 motion, plaintiffs cannot rely upon speculation, allegation, or contention. They need to bring to the underlying court evidence from Ms. Jarrett and Ms. Ingram that if this information had been available, they would have done certain things. But this same argument was presented to the court below, and that court said that's speculation. You have no evidence as to what they would have done. Would they have agreed? So in response to a Rule 56 motion, they must come forward with evidence to show what they would have done. Anything in the way of a statement. There's nothing in the record. Nothing. There's nothing from Jarrett or Ingram. Counsel, if I could ask you a question on that. You're basically arguing that in response to a summary judgment motion, they had to present evidence of what they would have done if something happened that didn't happen. So in a way, it's all speculative. Someone says, I might have done. It's hard to put Humpty Dumpty back together again if the offer wasn't transmitted. How can anyone ever know for sure what they would have done? If this was a trial setting, you could use compulsory process and question Ms. Ingram and make your point that she wouldn't have done anything and has no damages, but I'm not really understanding how that takes this out of a summary judgment setting. It requires, Your Honor, proof, evidence where you put in issue a contention that they come to the table and they say, if we had been told we would have done something else, that defeats your dispositive motion, the sworn testimony, the declaration from Ms. Ingram and Ms. Jarrett, who together have to present this scenario. There's nothing. All they say was we weren't told and therefore we lost on the opportunity to get a different result. Do you have a precedent, not an insurance coverage precedent, but a summary judgment precedent that suggests that in this type of situation, an insured would have to come up with an affidavit of what they would have done if they got the offer? A case that says, in a situation where an offer wasn't passed along, if the insured doesn't do an affidavit later about what they would have done, they're out for no damages. Well, to answer your question, Your Honor, I don't believe we have cited a case, I don't believe that was part of a briefing in light of the conclusion from the underlying judge. In our view, this position is speculation, pure speculation as to what would happen. And also, with the overlay being, those people are available to testify. Plenty of the appellants could have gone to them and said, when they got the assignment, and said, how about a declaration also on this issue? That wasn't before the court. Specifically to your question, Justice Gold, I don't believe we have in the brief the case that says that. I believe it to be a law. Would you want an opportunity to submit a supplemental brief on that issue if the panel ordered? Certainly. That you were allowed to do that? Certainly. I realize you would just, you'd want an affirmance tomorrow if you could get it. But if that isn't in the cards, and the court's still thinking about it, would you want to do a supplemental brief? Yes, Your Honor. I'm trying to be as clear as I can. Yes, Your Honor. I'm more than willing to take any opportunity to address these specific legal issues, but I think it is something the trial court saw was there's no evidence of what would have happened. But it is available if they had gotten it. And in response to a motion for summary judgment, you cannot rely upon speculation. Let me ask you, what's your view about this proposition we were discussing before about whether or not after May 13, when there was a rejection of the offer, whether after that, from then through the discussions with Ms. Ingram, at least on the 22nd or 23rd, that there was either a renewed offer or a continuation of the old offer or a rejuvenation of it, but anyway, that there was still an offer pending because communicated to her by the Victim's Counsel was the fact, was the proposition, tell your insurer to give full coverage. What's your view on that? I believe, Your Honor, there was one demand. And the language of the April 25, 1997 letter says this demand is open for 30 days. Yes, but you would admit, though, that there is hornbook law that says that if the insurer or in a contract, somebody rejects an offer expressly, which there is evidence that occurred on May 13, that there is no offer pending. Your Honor, in response to your question, the answer is there is such hornbook law. But on this record before this Court, clearly a week after Mr. Pelham's counsel writes this letter, he's in the phone conversation with Ms. Ingram saying, hey, tell your carrier to pay its limits to me. Okay, but wait a minute. Then we need to communicate here. You will agree that there was a rejection of the offer on May 13? On this record, there was a letter that said you rejected the offer. All right, so that offer of May 25 is gone. You agree with that? No, not on this record. Because there was continued rejection. You just said it was rejected on May 13. As of May 13, when it's rejected, the April 25 offer is gone. No, we don't have basically a state of mind that, oh, by the way, we're rejecting and we're no longer going to talk to you. The conversation continued. The negotiations continued. And if the Court made a comment earlier about how we live in the real world, this is how lawyers work. Well, wait a minute. Negotiations can happen in two settings, one where there's an offer on the table and one where there's no offer on the table and then just negotiating. And what I'm suggesting is that after May 13, it was the latter. Those are the type of negotiations. There were negotiations with no offer pending. Why is that wrong? The offer was continued, Your Honor. There's no statement from Appellant's Counsel that's saying we're not talking anymore, we're done. You know, I'm not throwing spears at you. I appreciate that. I want you to take something with it. Okay. Was it rejuvenated, this offer, or was there a new offer once the victim's lawyers communicate directly with Ms. Ingram, the insured? It's rejuvenated, Your Honor. And tell me why. Because the communications continued. Mr. Appellant's lawyer contacted Ms. Ingram. More importantly, when you look at the May 23 letter, it's very clear that the relationship with this offer is still outstanding because they revised the original offer, which is, by the way, still not a reasonable settlement offer capable of this. So on the 23rd, you're telling me that they say, okay, here's a new offer. I didn't read it that way. I say this is a revised offer of the original offer. This offer is continuing, and this is a revision of the original offer. Well, that's why I asked your opponent about the language of the May 23 letter because the first paragraph of that letter sure looks to me like the settlement offer is still on the table to pay the policy limits, but counsel is recognizing that we've got to resolve the outstanding claim of the passenger and figure out how much it's going to take to satisfy the passenger, and then it asks for offering my client the balance of the policy limits. That looks to me like the offer is still on the table. That's my reading of the letter, Your Honor. It's a continuation. And then he references the April 25 letter four times, or at least three times. And you continue the court's comments. Four times. You turn to the second page of that letter, and it continues on about this negotiation. Well, let me ask you this. Why isn't that the second type of negotiations that I was talking about, negotiations when there's not an offer on the table? Because the letter says, I advise you we, this is the plaintiff's lawyer talking, we should try and reach a settlement with the passenger and offer my clients the balance of the policy limits. Well, he's talking generally. They don't put numbers on it. Why isn't that just negotiation in the absence of an offer? It could be reviewed also, Your Honor, as negotiations. This is a proposal. Are you saying it could be viewed either way? I'm sorry. I view it as a continuation of the original offer. Okay. Counsel, Judge Gould, if I get, you know, this is a summary judgment setting. And just as one judge, I'll just say, I don't think with me it has any traction that that letter means the initial offer is outstanding. Because in a summary judgment letter, summary judgment context, that letter can just mean, okay, we, you know, the other people in the other car, we'd like you to get that back, get an offer back on the table and throw something in to get rid of your passenger or settle with the passenger and tell us what the net amount is. You know, it's all just talk. Your Honor, I understand your comment. As the advocate for the progressive, I've stated my position as to how this letter reads and what the intent of the conversation was. The offer was outstanding for 30 days. And this is within the 30-day period. Well, so then I'm looking at ER 65, which is the paragraph of the letter, I guess it's the penultimate paragraph in the last two sentences. As of the present time, we have received no policy limits offer. You have not even tried to enter into settlement negotiations. We will go against all personal assets of each of your insureds should you not respond to the policy limits demand within the time limits provided. So I read that language to say you've got two more days to respond to our policy limits offer. Yes, Your Honor. The offer was open for 30 days. In this last sentence, say, time limits provided. We're just basically talking within the 30-day period. Lawyers do that. So this is a continuation. And keep in mind, this is not a so-called policy limits demand. It is not a reasonable settlement offer. This proposal lacks the specificity required to be just that. But this demand is open for 30 days, and this letter establishes that. Negotiations continue. Counsel, I'm having trouble seeing how that letter can be viewed as implementing renewal of the earlier one that was rejected when, as part of that letter, it's saying make a settlement with the passenger and tell us what the net remaining is. That's exactly right. It's inviting. It may be inviting another demand or another maybe an offer, but it doesn't really sound like the first offer is open to me on its own terms. Well, maybe I've got it wrong. Anyway, I'll try to keep it open-minded. I'll let you make one conclusion. There was an offer, a proportionate amount, $6,000 in miscarriage of the balance to the appellants. Both sides rejected it. So there was no opportunity. The company tried to offer its limits to these diverse claimants to get a release for its policyholder. It was required to do. And I think the court has been very patient with me. Justice Murphy, I appreciate your patience. And I'd like to thank the court for its time. At the end, I think the court should affirm and grant you the motion for summary judgment in the full. All right. Thank you. Thank you. In the Kinder case, there was an offer to settle with multiple claimants involved, and that wasn't accepted. Then there were subsequent settlement discussions for even lower amounts than the original offer. And the Kinder case said, even though there were other claimants, that does not relieve an insurance company of the duty to communicate. We have been debating for a half hour as to whether or not the May 23rd letter is a new offer or the other offer was extinguished. But we're debating a fact question that has to be before the jury. The jury has to determine whether or not the previous offer was rejected and therefore not in existence. But the question is, isn't there only one way to interpret the proposition at the end of the May 23rd letter at Record 65, and that is that the demand is open, remains open. No. There's not one way to interpret that. By virtue of what we just heard from Progressive Counsel's argument, who struggled even to accept the court's suggestion for that. I thought he was just being courteous. No. No. He clearly said that the offer was rejected and then it was a new offer. And then if you look at the language, it's not even clear, the language. And ultimately, this is a factual question for the trial factor to determine. Was there an offer? Was there a second offer? Was it continuing to be opened? That's a factual question for the trial factor to determine. What does that last sentence mean? We will go against all personal assets of each of your insureds should you not respond to the policy limits demand within the time limits provided. Doesn't that mean our offer of April 25, 1997 on which we gave a 30-day deadline and it's still within the 30 days? We're waiting for Progressive to accept or reject? It does not. It's basically giving them a second opportunity to try to do the right thing. Doesn't that rejuvenate the offer? It does not rejuvenate the offer. Why not? Because it's already expired. Then there is no offer. At that time, the offer had already expired. This is a second offer. Then that sentence makes no sense. What's that? Then that sentence is completely meaningless. No, the sentence makes sense because there is a second offer being made at this time to try to include Jarrett and pay the balance to his clients. This is a new second offer just like what happened in Kinder. But the policy limits demand of that April 25 letter was to pay all $30,000 to Mr. McLarity's clients. Correct, and they did not. They chose not to and they rejected that on May 13th. Well, it seems to me that as of May 23rd, had Progressive said, okay, we'll give you $30,000, that would have been the response to that statement. That's a new settlement negotiation. That's a second offer. That's a second negotiation. That's exactly what happened in Kinder. It's a second offer with the same terms, pay all $30,000 to my clients. It's not with the same terms. All right. Well, you and I can go round and round. We'll puzzle it out as best we can. Thank you very much for your argument. The case just argued is submitted and will be adjourned for the day.
judges: Murphy, Gould, Tallman